## CARADINE HAT COMPANY ET AL. v. UNITED STATES

No. 7876.
Entry Nos. 415 and 568; 925 and 6570.

(Decided August 31, 1950)

*Tompkins & Tompkins* (*Allerton deC. Tompkins* of counsel) for the plaintiffs.
*David N. Edelstein,* Assistant Attorney General (*Richard H. Welsh, Dorothy C. Bennett,* and *John J. Antus,* special attorneys), for the defendant.

EKWALL, Judge: These are appeals for reappraisement of shipments of palm leaf hat bodies produced in the Tehuacan and Puebla

regions of Mexico and imported into the United States at the ports of St. Louis, Mo., and Laredo, Tex. The appraiser found values for a portion of the items in the shipments on the basis of foreign value (section 402 (c) of the Tariff Act of 1930, as amended), which values were higher than those at which the merchandise was invoiced and entered. As to those items, which will be enumerated below, the importers, plaintiffs herein, claim that the invoiced and entered values represent the export values which are the proper dutiable values (section 402 (d) of the same act). As to the items appraised at the entered values, the appeals are abandoned. At the hearing, plaintiffs' counsel stated plaintiffs' claim to be that the export and foreign values are the same. However, in the brief filed counsel claims there was no foreign value for these hats.

I set forth the items and the pertinent valuations as follows:

| Recap. No. | Entry | Merchandise | (Pesos) Inv. Price Per Gross | (Pesos) Entered Per Gross | (Pesos) Appraised Per Gross |
|---|---|---|---|---|---|
| 163958–A | 415 | Anisero St. | 36. 26 | 59.00 Less Aforo tax at 20.84 per gross Less Cartage at 0.20 per bale Plus Packing | 57.00 Plus Packing |
| 163958–A | 568 | Tlaxiaco Blanco | 50. 00 | As invoiced, plus wrappers, packing, labor and Mex. sales tax | 76. 00 |
| | | Tlaxiaco Bol. | 80. 00 | | 126. 00 |
| | | Tlaxiaco Lab. | 68. 00 | | 68. 00 (X) |
| | | Maravillas Colores | 80. 00 | | 91. 00 |
| | | Panchon sin remat. | 68. 00 | | 86. 00 |
| | | Tonalteco prim. | 53. 00 | | 70. 00 |
| | | Huapanapa Comun. | 85. 00 | | 85. 00 (X) |
| | | Huapanapa Fino | 92. 00 | | 92. 00 (X) All plus packing |
| 164076–A | 6570 | Anisero Huaj. | 51. 00 | As invoiced, plus packing, wrappers, labor, and stamp tax | 60. 00 |
| | | Maxayo | 53. 75 | | 65. 00 |
| | | Tlapeno St. | 53. 75 | | 65. 00 |
| | | Charrito bco. | 51. 00 | | 55. 00 |
| | | Nativitas | 100. 00 | | 100. 00 (X) |
| | | Copa Baja | 42. 00 | | 42. 00 (X) All plus packing |
| 164661–A | 925 | Ixcateco | 56. 00 | As invoiced, plus wrappers, packing and stamp tax | 60. 00 |
| | | Patlicha | 75. 00 | | 80. 00 |
| | | " | 75. 00 | | 80. 00 |
| | | Masayo Comun. | 50. 00 | | 65. 00 |
| | | Charrito Bl. | 49. 00 | | 55. 00 All plus packing |

(X)—Appraised as entered—Appeals abandoned as to these items.

The Government bases its proof of the foreign value at which the merchandise was appraised, on certain price lists issued by the Cía.

Exportadora e Importadora Mexicana, S. A. (which will be hereinafter referred to as CEIMSA), attached to collective exhibit A herein and to collective exhibit C, and upon the testimony. Apparently, the appraised values correspond to the prices set forth in the price list issued by the CEIMSA.

Plaintiffs contend in the brief filed that the invoice prices represent the prices at which various Mexican exporters, with the exception of CEIMSA, were freely offering the hats in question to United States buyers on the dates of exportation.

Plaintiffs' claims as set forth in the brief are in detail as follows:

(1) That there was no foreign value for the hats in question (Section 402 (c), Tariff Act of 1930) when they were exported.

(2) That the export value (Section 402 (d)) should be used for the purpose of determining dutiable value.

(3) That the prices set forth in CEIMSA's price lists did not apply to sales for domestic consumption in Mexico (not a basis for foreign value), and that they did not represent export values unless certain non-dutiable export taxes were first deducted therefrom.

(4) That the hats sold by CEIMSA for domestic consumption in Mexico were not the same as, or similar to, the hats here under appeal, and in any event, the prices quoted for such domestic sales were lower than the export values as claimed by Plaintiffs.

(5) That the entered prices represent the proper export and dutiable values.

There seems to be no dispute as to the usual wholesale quantity, which is one or more bales. The litigants also agree that the principal markets for these hat bodies are Tehuacan and Puebla.

At the hearing held at St. Louis, Mo., plaintiffs produced the testimony of the general manager of the Caradine Hat Company, the importer of the merchandise imported at that port, and a second witness who translated a document attached to and made part of plaintiffs' exhibit 17 in evidence. Plaintiffs also produced 16 exhibits of Mexican harvest hat bodies, together with 2 affidavits. The Government offered and there were received in evidence reports of Treasury agents, together with the testimony of the customs examiner at that port who advisorily appraised the merchandise imported there. His advisory appraisement was accepted and approved by the appraiser of that port. This witness identified numerous exhibits and stated that his advisory appraisement was made on the basis of foreign value for similar merchandise, which he also identified from the exhibits produced. On cross-examination he admitted that he had not seen merchandise sold in Mexico for domestic consumption similar to the exhibits in evidence and did not know whether such merchandise is the same or a poorer grade or whether it is damaged.

The case was transferred to Laredo, at which port the merchandise involved in reappraisements 164076-A and 164661-A was entered. The United States appraiser at that port, who previously had been

an examiner and who had examined harvest hats for about 29 years, testified on behalf of the Government. He stated that he had examined the merchandise here involved, which was entered at that port, and that he compared the various items with control samples which had been extracted from various importations of Mexican hats. He identified certain items in suit, represented by exhibit 10 and collective exhibit 10–A, and stated that they were substantially the same as the exhibits of the instant merchandise in evidence.

From the special agents' reports and the affidavits produced on behalf of the plaintiffs, it appears that these hats are woven by the Indians in the mountain districts of Mexico around the towns of Tehuacan and Puebla. They are collected by collectors or traders who visit the homes and villages of the weavers and buy the merchandise from them or trade other merchandise for the hats. The collectors dry the hat bodies and transport them to the towns for sale. It further appears that a Government-sponsored cooperative was formed, referred to above as CEIMSA. The record as a whole shows that the price finally paid for the hat bodies depends upon the bargaining abilities of the parties to the transaction. From the report of the special Government representative (collective exhibit A), it appears that CEIMSA is a nonprofit-sharing company organized for the purpose of assisting the Mexican Indians in finding a market for their products at a fair price. CEIMSA buys the products directly from the Indian home worker and endeavors to find a market therefor. The Mexican Government by the creation of this company hoped to eliminate the middleman and also to enable the Indians to obtain a fair price. Since 1940, CEIMSA has been in charge of the Government program for the purchasing and selling of hat bodies produced by the Las Mixtecas Indians and is an agency of the Mexican Government. Warehouses were established and collectors appointed in 12 centers where the Indian can sell his hat bodies without intervention of the middleman or having to go himself to Tehuacan to dispose of his merchandise. The collectors, who are managers of the CEIMSA warehouses located in their districts, are obliged to post daily bulletins showing the prices which CEIMSA will pay the Indians for the different types of hat bodies. Haulage to the central warehouse in Tehuacan costs CEIMSA on the average 2.50 pesos per bale. At the central warehouse CEIMSA grades, sorts, and clips the rough ends on the underside of the crown at an average cost to it of 1 peso per gross. The price paid by CEIMSA to the weavers is 15 per centum less than the CEIMSA selling price, which amount is set aside by CEIMSA to cover handling and office expenses. CEIMSA ascertains what price it can obtain from the American buyer before establishing the price it will pay the Indian home worker. All cooperative organizations have been exempted from paying the stamp

tax. In order to take advantage of this tax exemption, the Indian weavers have set up regional cooperative societies in the region of Las Mixtecas, of which there were 12 in December 1946. These are banded together in a "Federation of Co-operative Weavers." CEIMSA has been appointed by the federation as its selling agent and is allowed a 15 per centum commission between the purchase price paid the Indian weaver member and the final sales price, this to be used by CEIMSA to cover its operational expenses.

Although the Government tax exemptions might seem to be in the nature of subsidies, the general manager of the federation stated to the Treasury representative that these payments to the Indians were merely a simplified form of bookkeeping; instead of collecting the aforo and stamp taxes on each exportation and then paying the Indian a subsidy, the Mexican Government permits the Indian members of the cooperative societies to receive the benefits of the taxes immediately by permitting them to include such taxes in the unit price. The members, therefore, obtain a higher price for their merchandise than does the nonmember Indian weaver whose merchandise is subject to these taxes when exported. The report further states that the manager stated that anyone can purchase hat bodies from cooperative members and be exempt from the payment of the aforo and stamp taxes, providing he pays the minimum price established by the federation and permits the federation to inspect the hat bodies prior to exportation so as to verify the fact that the merchandise was actually purchased from one of the cooperative societies.

It further appears from this exhibit that while CEIMSA tries to sell merchandise at a price with all charges extra, its clients refuse to pay the full amount of packing expenses, so part of the expenses is included in the unit price and an extra charge is made for part of these expenses. For the reason that importers have never agreed to accept the high cost of labor and material for packing, CEIMSA has absorbed the difference between the actual cost and the price that importers will pay. Such or similar merchandise to that in suit was and is freely offered for sale to all purchasers for exportation to the United States, without restriction as to resale or use.

Defendant's claim that there was a foreign value for these or similar hat bodies appears to be supported by the statements of the special agent in collective exhibit A that there were four domestic sales of hat bodies during February, March, and April 1946; data in relation to these sales are set forth in said exhibit. However, this evidence is contradicted by affidavits sworn to by Mr. Antonio Rivero Osuna (collective exhibit C and exhibit D) which state that there were no domestic sales of such or similar hat bodies. Exhibit D states as follows:

* * * The following four sales made in 1946 to domestic buyers in Mexico consisted of off-grade, sub-standard or damaged hats which would not meet the

export specifications of foreign or United States buyers. The mere fact that similar names were used on domestic sales to those used on foreign sales was merely for the purpose of identification, but the fact remains that the hats sold domestically were not the same as, or commercially similar to, other hats sold by Compania Exportadora e Importadora Mexicana, S. A. for export. It will also be noted that the prices for the merchandise covered by the said four domestic sales were much lower than the prices specified in the said price lists nos. 599, 600 and 601.

Upon this record I find that the evidence produced on behalf of the plaintiffs in support of their claim that no foreign value exists for such or similar hat bodies as those here involved is sufficient to overcome the presumption of correctness attaching to the appraiser's finding of foreign value herein. The documentary evidence introduced by the plaintiffs, as to free offers to sell, confirms the entered prices as being representative of the prices on or about the dates of exportation at which such merchandise was being freely offered for sale in the principal Mexican markets to United States buyers in the usual wholesale quantities and in the ordinary course of trade.

On the question of whether the Mexican aforo tax should apply to these sales, I find that said taxes are separately set forth in the various consular invoices before me. It is clear from the evidence produced that these taxes form no part of the export value. They are assessed only upon exportation of the hat bodies. The law is well settled that an export tax, which as in the case of all of the independent Mexican sellers of these hat bodies forms no part of the selling price, and which is assessed only upon the exportation of an article, cannot properly be included as a part of the export value of such merchandise. See *Sternfeld* v. *United States*, 12 Ct. Cust. Appls. 172, T. D. 40065; *United States* v. *Tadross & Co. et al.*, 14 Ct. Cust. Appls. 10, T. D. 41528.

Upon the whole record I find:

(1) That the merchandise consists of hat bodies imported from Mexico during the months of March, July, and August 1946.

(2) That the principal markets for such hat bodies were in Tehuacan and Puebla.

(3) That at such time such or similar merchandise was not freely offered for sale to all purchasers in said principal markets for domestic consumption.

(4) That at such time such or similar merchandise was freely offered for sale for exportation to the United States to all purchasers in said principal markets.

(5) That the prices at which such or similar merchandise was sold or offered for sale for exportation to the United States to all purchasers in the usual wholesale quantities and in the usual course of trade were the entered prices, which did not include the so-called aforo tax.

I conclude as matters of law:

(1)   That in each of the reappraisements before me, export value, as that value is defined in section 402 (d) of the Tariff Act of 1930, of the hat bodies in issue at the time of exportation, in the usual wholesale quantities and in the ordinary course of trade, is the proper basis of value.

(2)   That such values are the prices at which such hat bodies were being freely offered for sale to United States buyers by independent Mexican exporters, at the time of exportation, in the usual wholesale quantities and in the ordinary course of trade, which were exclusive of the aforo taxes.

(3)   That such export values are the entered values in each case. Judgment will be rendered accordingly.